

# NUMBER 13-24-00595-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

LAQUITHA LASHAWN GABRIEL,                                    Appellant,

v.

THE STATE OF TEXAS,                                          Appellee.

## ON APPEAL FROM THE CRIMINAL DISTRICT COURT NO. 2
## OF TARRANT COUNTY, TEXAS

# MEMORANDUM OPINION

**Before Justices Silva, Peña, and Fonseca**
**Memorandum Opinion by Justice Silva**

A jury found appellant Laquitha Lashawn Gabriel guilty of continuous sexual abuse of a young child, a first-degree felony. *See* TEX. PENAL CODE § 21.02(b), (h). The jury assessed Gabriel's punishment at seventy-five years' imprisonment. By three issues, Gabriel argues the trial court abused its discretion in admitting and refusing to admit certain evidence during her trial. We affirm.

## I. BACKGROUND[1]

An amended indictment alleged by a single count that Gabriel committed one count of continuous sexual abuse of a young child. *See id.* § 21.02(b). Specifically, the amended indictment alleged that Gabriel, while seventeen years of age or older, committed two or more acts of sexual abuse against Jill,[2] a child younger than fourteen years of age, during a period that was thirty or more days in duration. *See id.* The specific acts of sexual abuse alleged were sexual assault of a child and indecency with a child. *See id.* §§ 22.011, 21.11. The amended indictment also alleged Gabriel committed five counts of sexual assault of a child against Jill and five counts of indecency with a child against Jill. *See id.* §§ 22.011, 21.11.

Gabriel's trial spanned three days. The jury heard testimony from Jill and Jill's sister Jackie, who are both Gabriel's biological daughters, among other witnesses. The evidence revealed that in May 2019, Jill, who was seventeen at the time, told a friend and that friend's mother that she had been sexually abused by Ricky King, Gabriel's boyfriend, for five years. Jill's friend's mother reported this to Child Protective Services, who then reported it to the Fort Worth Police Department (FWPD). Shortly after, Jill moved out of the home to live with her grandmother in Mesquite, Texas. Jill was interviewed at the

---

[1] This case is before the Court on transfer from the Second Court of Appeals pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE §§ 22.220(a) (delineating the jurisdiction of appellate courts), 73.001 (granting the supreme court the authority to transfer cases from one court of appeals to another at any time that there is "good cause" for the transfer). We are bound by the precedent of the transferring court to the extent that it differs from our own. *See* TEX. R. APP. P. 41.3.

[2] We use a pseudonym to protect the identity of the minor child. *See* TEX. CONST. art. 1, § 30(a)(1) (providing that a crime victim has "the right to be treated . . . with respect for the victim's dignity and privacy throughout the criminal justice process"). Out of an abundance of caution, we will also use pseudonyms to identify her immediate family members.

2

Dallas Children's Advocacy Center in June 2019 and spoke to a forensic interviewer about the abuse. A sexual assault nurse examiner with the Cook Children's Medical Center examined Jill in July 2019 and Jill disclosed details of the sexual abuse. That same month, Gabriel voluntarily interviewed with police and denied having any knowledge of Jill's sexual abuse. Jackie, who was nineteen at the time, also interviewed with police and initially denied that she had been sexually abused by King. FWPD subsequently executed a search warrant for King and Gabriel's home and arrested them on the same day. Police took several photographs of the residence that were admitted into evidence, including some which depicted a bedroom that Jill and Jackie referred to as King's "man cave." Jackie spoke with police again in 2024 and disclosed King had sexually abused her for years.

Jill was twenty-two years old at the time of trial. She testified King had sexually abused her since she was twelve. Jill stated she and King had vaginal intercourse a few times a week over a period of five years. Most of the sexual abuse occurred in King's "man cave." Jill explained prior to the first incident of sexual abuse that King and Gabriel had conversations with her about losing her virginity. According to Jill,

> [King] would say, "You should do it with someone you trust, a male figure that you trust," and he would say, "Like myself. If you were to—if I were to take your virginity, I would make sure it wouldn't hurt, and I would take care of you." And [Gabriel] would be there as that conversation was happening, and she would be there sometimes during the conversation and be like, "Yeah, he wouldn't do that. He wouldn't hurt you if you were to have sex with him," yeah.

Jill stated King used a condom the first time they had sex, which took place in the master bedroom where King and Gabriel slept. Subsequently, Gabriel took Jill to the doctor to

3

get on birth control. According to Jill, Gabriel told her that King wanted Jill on birth control to prevent her from becoming pregnant. After Jill was on birth control, King never used a condom again.

Jill described an incident where she, Jackie, Gabriel, and King were in the master bedroom. Jill testified, "Sometimes he would be laying on the bed with my mom next to him, and he would, like, stick my head underneath the covers and try to get me to give him oral sex." Jill stated Gabriel observed this and did not say anything or try to stop King. Jill also described another incident where King became upset after Gabriel walked in on Jill and King having sex in the "man cave." Jill stated Gabriel apologized and said, "I'll come back when you guys are done" and left the room. Jill explained King would also have her use a silver vibrating massager, which he placed on her vagina, during intercourse.

Jill further testified King called her his girlfriend and that he would get upset when she refused to have sex. She explained King would "punish" her by taking her clothes and belongings away from her and ignoring her. Jill testified Gabriel told her she didn't have to be his girlfriend, that they could instead have a "friends with benefits relationship" and "all [Jill] had to do was just sleep with [King] so he wouldn't be mad at [Jill] anymore."

Jill also explained King and Gabriel would sometimes get into arguments, and then King would go to the garage, sit in one of the cars, and threaten to leave and never move back. Gabriel would then talk to him and then tell Jill he wanted to talk to her. Jill went out to the garage and sat in the car with King, and he would say he wanted to have sex. They both would then leave the garage and go have sex in the "man cave." Gabriel was present

4

when Jill and King went upstairs. Jill stated she believed Gabriel knew that Jill and King were going to have sex, and that was the reason Gabriel told her that King wanted to talk to her in the first place. In addition, Jill stated King had once urinated on her and her sister in a bathroom.

Prior to Jackie's testimony, the State requested a hearing outside the presence of the jury regarding her testimony. The trial court then conducted the hearing and heard arguments from the parties. At the hearing, Gabriel argued that Jackie's testimony violated Texas Rule of Evidence 403, that the State could make its case without her testimony, and that her testimony was cumulative. *See* TEX. R. EVID. 403. Gabriel further argued "as extraneous conduct, [the Rule 403] balancing test is extremely important." The State responded that Jackie's testimony was admissible under Texas Code of Criminal Procedure Article 38.37, and because the jury could consider it "for any purpose, even propensity evidence," her testimony was "more probative than it [was] prejudicial." Gabriel then argued "[Article 38.37] does not mention [Rule] 403, and it would be extraordinarily prejudicial, and . . . that [Jackie's testimony] will not pass the balancing test." Gabriel also reiterated Jackie's testimony would be cumulative because it would be similar to Jill's testimony. The trial court overruled Gabriel's objection, stating:

> All right. I'm referring both to [Articles] 38.37 and 38.371. [Article] 38.37 basically talks about evidence of extraneous offenses or acts, and it basically states: Notwithstanding [Rules] 404 and 405 of the Texas Rules of Evidence, evidence of other crimes, wrongs, or acts committed by the defendant against a child who's the victim of the alleged offense shall be admitted for its bearing on relevant matters, including the state of mind of the defendant and the child, and the previous and subsequent relationship between the defendant and the child.
>
> I think that's what [the prosecutor] is referring to when he calls this

5

witness also, but then [Article] 38.371 is evidence committed against a member of defendant's family or household, which effectively relates to this case, of course.

And the legislature included this in the Rules of Evidence, and basically it states that extraneous offense evidence may be relevant for a noncharacter-conforming purpose to prove the nature of the relationship between the defendant and the victim in this type of domestic violence case.

So basically, the legislature has allowed this notwithstanding the test that the Court gives on whether or not evidence is probative and prejudicial, and, of course, any type of evidence that we're dealing with, sexual assault of children, is going to be prejudicial. I mean, we know that, but I think the legislature took this in mind when they codified both [Articles] 38.37 and 38.371. So the Court's going to allow it.

Jackie was twenty-four years at the time of trial. She stated that when she was fourteen, King asked her to be his girlfriend and told her he had gotten permission from Gabriel to do so. When Jackie asked Gabriel about her giving King permission, Gabriel said "Yes, but that's still your choice." Jackie explained she and King had penetrative vaginal sex multiple times a week for seven years, from when she was fourteen to twenty-one years old. Jackie stated she told Gabriel many times over the years that she did not want to have sex with King, and Gabriel would reply that Jackie could stop it if she wanted to and that it was her choice. However, Jackie explained when she and Jill refused to have sex with King, Gabriel would try to persuade them to continue to have sex with him "just to please him and keep him to stay." Jackie also stated that King, in Gabriel's presence, once stated he wanted to urinate on Jackie and Jill. Gabriel said nothing nor objected to it. King told the girls to go to the bathroom, they did, and King urinated on them.

Jackie explained she told FWPD in 2019 that she had not been sexually abused out of fear. She stated King told her not to say anything, that no one would believe her if

6

she said anything, and she would be harmed even if King went to prison. However, Jackie testified she was finally able to leave King and Gabriel's home in 2024 and spoke to police about the sexual abuse she endured a few weeks after moving out. Jackie claimed King and Gabriel had removed all the "vibration things" that King used prior to the police executing the search warrant of the home. She testified the "vibration things" were kept in a dresser or closet in the "man cave."

After the jury heard Jackie and a few other witnesses testify, the trial court heard arguments outside the presence of the jury pertaining to the State's request to present evidence that King and Gabriel attempted to commit suicide together and that King died as a result. The State argued this evidence showed consciousness of guilt and would rebut Gabriel's defensive theories that the sexual abuse never happened and that she lacked knowledge of it. The prosecutor also argued that

> presenting only her suicide attempt without any information regarding his is substantially more prejudicial than it is probative on our end because it leaves a false impression from the jury. They may be left wondering that he's out on the run, that we haven't found him, and, you know, maybe she's taking her life because for other reasons than her guilt.

Gabriel's counsel responded that evidence of King's suicide presented a "confrontation problem because there's no way to present any kind of rebuttal to what . . . King's state of mind might have been." Gabriel's counsel also argued evidence of Gabriel's attempted suicide would require the jury to "guess as to the reason," that "[m]any people commit suicide who have done nothing wrong," and that "[m]any people [who] have committed suicide have had multiple attempts regardless of any criminal pending case." In addition, Gabriel's counsel suggested "before you can make some kind

7

of inference like [consciousness of guilt], there should be an expert to say what was this specific suicidal person's . . . state of mind."

The trial court permitted the State to present evidence of Gabriel's suicide attempt as consciousness of guilt, but it would not permit evidence of King's suicide, initially citing the Sixth Amendment's Confrontation Clause. The State pointed out that the Sixth Amendment did not apply because they were not offering any testimonial statement from King. The trial court then stated "any testimony concerning [King] would be more, I believe, prejudicial than probative." Thereafter, the following exchange occurred:

| | |
|---|---|
| [Gabriel's counsel]: | And as an ironic after note, Judge, certainly should my client still desire to testify, if it's coming out in cross, I'm going to bring it out in direct. So just a little irony. |
| THE COURT: | You're going to bring what out? |
| [Prosecutor]: | Yeah, I'm confused. |
| [Gabriel's counsel]: | Well, if . . . the State can cross her about [King], I don't want them to be the first ones to— |
| THE COURT: | No, they're not going to question her about [King]. They're going to question her about herself. |
| [Prosecutor]: | Well, Your Honor, if the door is open, though, I think is what [Gabriel's counsel] is getting at, if I'm following correctly. |
| [Gabriel's counsel]: | I understood [the Court] to say that, of course, if she testifies, it's all fair game. |
| THE COURT: | No, no, no. It's all fair game about her. |
| [Gabriel's counsel]: | Thank you. |
| THE COURT: | But [the prosecutor] is right. If you open the door |

8

because you ought to be—she would be your witness. So if you open the door and y'all get into any discussions about [King] or the fact that, you know, he might have committed suicide or attempted to consider suicide, then, of course, they can cross-examine her on that, but I think you know full well how the questions are concerning that.

[Gabriel's counsel]: Yeah, but it's a door that could open quite easily, Judge.

THE COURT: Well, but that would be on you. It's not on the State.

[Gabriel's counsel] I know.

THE COURT: Okay. All right. Just be aware of that.

[Gabriel's counsel]: I am, Judge.

THE COURT: All right. Because I've already said that [the State] can't get into it, but if you get into it, then the door's open. It's wide open. [The State] can get into anything they want if you bring it up.

[Gabriel's counsel]: Sure. I just wanted to clarify because I misunderstood.

THE COURT: No, no, no. We're good on that. They're not going to get into anything about [King] unless the door is open.

[Gabriel's counsel]: Okay. Thank you, Judge.

THE COURT: And that would be through her testimony if she decides to take the stand.

The State thereafter presented the testimony of another witness and rested its case-in-chief.

Gabriel testified in her own defense and generally disputed Jill and Jackie's

9

testimony concerning King's sexual abuse and her knowledge and role in it. Specifically, Gabriel stated her daughters' story was "ridiculous." According to Gabriel, King had several physical health conditions including chronic kidney disease, diabetes, high blood pressure, and high cholesterol. Gabriel also stated King had mental health conditions, including depression, anxiety, bipolar, and schizoaffective disorder. She testified King took more than one or two medications that caused him to have difficulty functioning sexually a majority of the time. She also stated his kidney disease affected his genital region and that he suffered pain. Gabriel explained King had a stent that was inserted through his penis in order to help him pass kidney stones, and that his recovery from this outpatient procedure involved lying in bed on medication and in a lot of pain. Gabriel indicated that some of the medication caused King to have erectile dysfunction and made him very sleepy. He had five stent procedures between 2016 to 2018, and each time the stent would be inserted for a few weeks and cause him discomfort. When asked whether it made sense that King "would have been physically able to have sex that many times a week," Gabriel replied, "No, it does not."

On cross-examination, Gabriel suggested Jackie moved out of her home because she did not want to pay bills or follow her rules. Gabriel admitted she stayed with King for years after Jill moved out of the home. During a bench conference, the State requested permission to ask Gabriel about her suicide attempt and King's suicide, arguing Gabriel had opened the door to both. The trial court granted the State's request, and the following exchange occurred:

[Gabriel's counsel]:	How was that door opened?

10

| | |
|---|---|
| THE COURT: | Well, it was opened when you said that [King] was not physically able to have sex. |
| [Gabriel's counsel]: | What's that got to do with suicide if he couldn't— |
| THE COURT: | Consciousness of guilt. |
| [Gabriel's counsel]: | Huh? |
| THE COURT: | It's consciousness of guilt, and I told you to be careful about all of that. You opened the door. |
| [Gabriel's counsel]: | I don't know how. |
| THE COURT: | I can tell you how. When you said to the jury was [King] physically able to have sex, and she said no. |
| [Gabriel's counsel]: | What's that got to do with suicide? |
| THE COURT: | Well, it's consciousness of guilt. |
| [Gabriel's counsel]: | What's that got to do with suicide? |
| THE COURT: | I've already told you. |
| [Gabriel's counsel]: | Okay. |

After the bench conference, the State asked Gabriel if she was aware that King was set for trial on the same charges she was facing on June 24, 2024, and she responded, "Yes." Gabriel stated she was with King on that day. The State then asked if she and King tried to kill themselves together, and Gabriel's counsel lodged objections based on Texas Rules of Evidence 401, 402, 403, and 404. The trial court overruled the objections.

Gabriel then affirmed she and King tried to commit suicide together on June 24, 2024, the same day a jury was supposed to be selected for King's trial. When asked why they both tried to kill themselves, Gabriel replied, "Because of life and I have issues and

11

just stuff we've been dealing with throughout our lifetime." Gabriel also affirmed the double suicide attempt had nothing to do with her or King's trial. Gabriel admitted King's suicide attempt was successful. Gabriel also affirmed she wrote a "suicide note" addressed to her sister, which was admitted into evidence, stating, "My health is declining, and I refuse to live behind jailhouse bars for something I didn't do." She indicated that she remained in the hospital after her suicide attempt until July 4, 2024. She also testified she had previously attempted to commit suicide in 2014.

Darla Hallman, Gabriel's friend, also testified during Gabriel's case-in-chief. During her testimony, Hallman stated she had a conversation with Jackie concerning "the situation." When Gabriel's counsel asked Hallman what Jackie said, the State lodged a hearsay objection. The following exchange occurred:

| [Gabriel's counsel]: | This would be a statement against interest on [Jackie's] part if it would expose her to potential . . . liability for making a false statement. |
| --- | --- |
| THE COURT: | That's your legal— |
| [Gabriel's counsel]: | In addition, with further exploration, if we need to lay a foundation for a prior inconsistent statement. |
| THE COURT: | No. That's sustained. |

Hallman continued testifying and the State cross-examined her. Gabriel rested her case-in-chief, then made an offer of proof outside the presence of the jury concerning what Hallman would have testified to had she been permitted to do so. During this offer of proof, Hallman testified that around summer of 2019, Jackie told her, "'Well, I made a statement to the police, and you know, I told them, you know, what I said—what I had to

say. I wrote out a statement.' And then she said, '[Jill] is lying.'" Gabriel's counsel then argued that this testimony concerning this statement was inconsistent with Jackie's trial testimony, but Gabriel's counsel admitted she needed "[Jackie] to lay the predicate for that." The State responded that the statement was not inconsistent with Jackie's testimony concerning her interview with police, and then the following exchange occurred:

| [Gabriel's counsel]: | Your Honor, I think the determination would be, is it inconsistent with what her testimony is today? [Jackie's] testimony today did not say it was a lie. |
| --- | --- |
| | What she said to the detective was, "I don't know if—I don't think anything happened. I don't really believe it. I don't think anything happened. She just wants what she wants." |
| | And this is of a different magnitude when she says, "It's a lie. [Jill] is lying." |
| THE COURT: | Well, I haven't heard anything that she said to the detective at all. I mean, this is just something that you're telling me. |
| [Gabriel's counsel]: | There was testimony about her interview with the detective. |
| [Prosecutor]: | But we didn't get into the statements because it would have been hearsay. |
| THE COURT: | Right. |
| [Prosecutor]: | When . . . [the other prosecutor] question[ed] the detective, like at most she went into was, like, did [Jackie] disclose any sexual abuse. We didn't get into the statements because that would be hearsay. |
| | And then when I was questioning [Jackie] myself, I just asked her, "Did you tell you were not sexually abused?" I didn't ask her any |

13

| | questions about [Jill]. I just asked [Jackie], "Did you tell the police that you were not abused? Why did you do that?" "Because they told me to lie." |
|---|---|
| THE COURT: | I mean, that's how I heard it. That's a fact issue for the jury to make those decisions on who's telling the truth anyway. So I'm not going to allow anything else on that. |

Thereafter, the State informed the trial court it had no rebuttal witnesses it wished to present and rested.

The next day, the trial court read its charge to the jury. The charge included an abstract instruction on the law of parties pursuant to Texas Penal Code Section 7.02(a). *See* TEX. PENAL CODE 7.02(a)(2) ("A person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; or . . . having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent commission of the offense."). In addition, the charge included the law of parties in the application portion for each count. *See id.* After hearing closing arguments, the jury found Gabriel guilty of continuous sexual abuse of a young child and sentenced her to seventy-five years' imprisonment. This appeal followed.

## II.    EVIDENTIARY RULINGS

### A.    Standard of Review and Applicable Law

"We review a trial court's evidentiary rulings for abuse of discretion." *Reyna v. State*, No. 13-24-00207-CR, ___ S.W.3d ___, 2026 WL 842977, at *3 (Tex. App.—Corpus

14

Christi–Edinburg Mar. 26, 2026, no pet.) (citing *Inthalangsy v. State*, 634 S.W.3d 749, 754 (Tex. Crim. App. 2021)). This standard of review applies to a trial court's decision to admit or exclude extraneous-offense evidence. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). There is no abuse of discretion unless a trial court's decision to admit or exclude evidence lies outside the zone of reasonable disagreement. *See id.* at 343–44. "Furthermore, we will uphold a trial court's evidentiary ruling, even if the trial court's reasoning is flawed, if it is correct on any theory of law that finds support in the record and is applicable to the case." *Wishert v. State*, 654 S.W.3d 317, 330 (Tex. App.—Eastland 2022, pet. ref'd) (first citing *Henley v. State*, 493 S.W.3d 77, 93 (Tex. Crim. App. 2016); and then citing *Dering v. State*, 465 S.W.3d 668, 670 (Tex. App.—Eastland 2015, no pet.)).

Rule 404(b) of the Texas Rules of Evidence limits character evidence, but it is nevertheless a rule of inclusion. TEX. R. EVID. 404(b); *De La Paz*, 279 S.W.3d at 343. Rule 404(b) precludes the admission of evidence of a crime, wrong, or act solely to prove a person's character to show that he acted in conformity with that character on a particular occasion, but the rule allows for such evidence to be admitted for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." TEX. R. EVID. 404(b)(2). Those listed purposes "are neither mutually exclusive nor collectively exhaustive." *De La Paz*, 279 S.W.3d at 343.

Notwithstanding Rule 404(b), Article 38.37 permits the admission of evidence of prior sexual offenses for "any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the

15

defendant," when the charged offense concerns continuous sexual abuse of a young child. TEX. CODE CRIM. PROC. art. 38.37, § 2(b); *see also id.* art. 38.37, § 2(a)(1)(B); TEX. R. EVID. 404(b). Thus, extraneous offense evidence admitted under Article 38.37 "is, by definition, propensity character evidence" that the Legislature has deemed "admissible notwithstanding those characteristics." *Harris v. State*, 475 S.W.3d 395, 402 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd). "Article 38.37, Section 2(b) allows for the admission of evidence that the defendant has committed a separate offense of *a sexual nature against a child*; the 'child victim' of the separate offense need not be the victim of the offense for which the defendant is currently on trial." *Wishert*, 654 S.W.3d at 330 (emphasis in original). "For this type of evidence to be admissible under Article 38.37, Section 2(b), the defendant need not have been charged with, tried for, or convicted of the separate offense." *Id.* at 331 (citing *Castillo v. State*, 573 S.W.3d 869, 880–81 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd)).

Before admitting such evidence, the trial court "must" conduct a preliminary hearing outside the presence of the jury to "determine that the evidence likely to be admitted at trial will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt." TEX. CODE CRIM. PROC. art. 38.37, § 2-a. A trial court may exclude evidence admissible under Article 38.37 if its probative value is "substantially outweighed" by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403; *see* TEX. CODE CRIM. PROC. art. 38.37, § 2(b) (excepting evidence admitted under Article 38.37 from the application of Rules 404 and 405 but not

Rule 403). However, to trigger a balancing test under Rule 403, the defendant must make a timely objection or request. *Belcher v. State*, 474 S.W.3d 840, 847 (Tex. App.—Tyler 2015, no pet.) ("When evidence of a defendant's extraneous acts is relevant under Article 38.37, Section 2(b), the trial court is still required to conduct a Rule 403 balancing test upon proper objection or request."); *see also Killinger v. State*, No. 13-17-00016-CR, 2020 WL 728305, at *4 (Tex. App.—Corpus Christi–Edinburg Feb. 13, 2020, pet. ref'd) (mem. op., not designated for publication) (discussing the procedures for admitting evidence under Article 38.37 and noting that, "[u]pon proper objection, the trial court must also conduct a balancing test under Rule 403"); *White v. State*, No. 03-17-00504-CR, 2019 WL 2518755, at *13 (Tex. App.—Austin June 19, 2019, no pet.) (mem. op., not designated for publication) ("Once a Rule 403 objection is asserted, the trial court must engage in the balancing test required by that rule."). A proper Rule 403 analysis includes consideration of the following non-exclusive factors: "(1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and, (4) the proponent's need for the evidence." *Prible v. State*, 175 S.W.3d 724, 733 (Tex. Crim. App. 2005).

## B. Analysis

### 1. Jackie's Testimony

In her first issue, Gabriel argues the trial court abused its discretion in admitting Jackie's testimony of sexual abuse committed against her because it "failed to apply the proper statutory provisions in conducting its Article 38.37 hearing and further failed to apply [Rule] 403 in making its decision." Specifically, Gabriel points to the trial court's

pronouncement of its ruling on her objections to argue the trial court by its "own words . . . appear[ed] to have refused to consider [Rule] 403, and further relied on Section 1 of Art[icle] 38.37 rather than on Section 2" when admitting Jackie's testimony. *See* TEX. CODE CRIM. PROC. art. 38.37, § 2-a(1)–(2); TEX. R. EVID. 403. The record demonstrates Gabriel's sole objection to Jackie's testimony during the trial court's Article 38.37 hearing was that said testimony violated Rule 403. *See* TEX. CODE CRIM. PROC. art. 38.37, § 2-a(1)–(2); TEX. R. EVID. 403. In other words, Gabriel did not object that Jackie's testimony was not admissible under Article 38.37. *See* TEX. CODE CRIM. PROC arts. 38.37.

To preserve a complaint for appellate review, the point of error raised on appeal must comport with the objection made at trial, or error is not preserved. *Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016); *Bekendam v. State*, 441 S.W.3d 295, 300 (Tex. Crim. App. 2014). While appellate courts "have long eschewed hyper-technical requirements for error preservation" and that one "need not employ 'specific words or technical considerations' to avoid forfeiting their complaints," the objecting party must "let the trial court know what he wants and why he feels himself entitled to it clearly enough for the judge to understand him." *Vasquez v. State*, 483 S.W.3d 550, 554 (Tex. Crim. App. 2016). "[A] general or imprecise objection will not preserve error for appeal unless 'the legal basis for the objection is *obvious* to the court and to opposing counsel.'" *Id.* (emphasis in original) (quoting *Buchanan v. State*, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006)). To the extent Gabriel complains the trial court erred in admitting Gabriel's testimony pursuant to Article 38.37, we conclude she failed to preserve that issue because she did not object to the admission of her testimony on that basis. *See Thomas*,

18

505 S.W.3d at 924; TEX. R. APP. P. 33.1(a).

Regarding her Rule 403 complaint, we note a trial court is required to conduct a 403 balancing test to determine whether evidence should be excluded upon a proper objection or request. *See Belcher*, 474 S.W.3d at 847; *see also Killinger*, 2020 WL 728305, at *4; *White*, 2019 WL 2518755, at *13. But the trial court is not required to conduct a formal Rule 403 hearing or announce that it is conducting the balancing test, and it "is not required to place the results of its balancing test on the record." *Colvin v. State*, 54 S.W.3d 82, 85 (Tex. App.—Texarkana 2001, no pet.) (citing *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997)). "Rather, the trial court is presumed to engage in the required balancing test once a party objects on the ground of Rule 403 and the trial court rules on the objection, unless the record indicates otherwise." *Id.*; *see also Williams*, 958 S.W.2d at 195–96; *Maldonado v. State*, 452 S.W.3d 898, 906 (Tex. App.—Texarkana 2014, no pet.).

Here, upon admitting the complained-of testimony, the trial court expressly stated in relevant part:

> So basically, the [L]egislature has allowed [extraneous offense testimony] notwithstanding the test that the Court gives on whether or not evidence is *probative and prejudicial,* and, of course, any type of evidence that we're dealing with, sexual assault of children, is going to be prejudicial. I mean, we know that, but I think the [L]egislature took this in mind when they codified both [Articles] 38.37 and 38.371. So the Court's going to allow it.

(emphasis added). The trial court's comments indicate it believed Articles 38.37 and 38.371 served as categorial exceptions to Rule 403, which is incorrect because evidence admitted under those articles are excepted from application of Rules 404 and 405, not Rule 403. *See* TEX. CODE CRIM. PROC. arts. 38.37, 38.371. Under these circumstances,

19

we conclude the record affirmatively indicates the trial court did not perform the balancing test, and thus, the presumption the trial court engaged in the required balancing test does not apply. *See Colvin*, 54 S.W.3d at 85. Because such failure was error, we must assess whether Gabriel suffered harm. *See id.* at 85–86 (applying the Rule 403 balancing test and concluding that the trial court's failure to conduct the balancing test did not affect the appellant's substantial rights); *see also Wishert*, 654 S.W.3d at 332 (same); *Daraghmeh v. State*, No. 05-13-01127-CR, 2014 WL 7269924, at *4–5 (Tex. App.—Dallas Dec. 22, 2014, no pet.) (mem. op., not designated for publication) (same).

"[A] trial court's erroneous admission of evidence does not result in constitutional error; therefore, it will be disregarded if the error did not affect the defendant's substantial rights." *Wishert*, 654 S.W.3d at 332 (first citing TEX. R. APP. P. 44.2(b); then citing *Garcia v. State*, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004); and then citing *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)). A substantial right is implicated when the trial court's error had a substantial or injurious effect or influence in determining the jury's verdict. *See Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014). In assessing the likelihood the jury's decision was adversely affected by the error, we must consider the entire record, including all the evidence presented at trial, the nature of the evidence supporting the jury's verdict, the character of the alleged error and how it might be considered together with the other evidence in the case, the trial court's instructions to the jury, and whether the evidence of the defendant's guilt is overwhelming. *See Motilla v. State*, 78 S.W.3d 352, 355–58 (Tex. Crim. App. 2002). Further, in making that determination, we are not concerned with whether there was sufficient evidence on which

20

the defendant could have been convicted, but rather whether there is a reasonable possibility that the erroneously admitted evidence might have contributed to the conviction. *See Lopez v. State*, 288 S.W.3d 148, 178 (Tex. App.—Corpus Christi–Edinburg 2009, pet. ref'd). Therefore, reversal is not required if, after reviewing the entire record, we have fair assurance the error did not influence the jury's verdict or had only a slight effect. *See Motilla*, 78 S.W.3d at 355; *Johnson*, 967 S.W.2d at 417.

"At the outset, our harm analysis requires that we first determine if the danger of unfair prejudice substantially outweighed the probative value of the challenged evidence, and then, if it did, whether the admission of the extraneous evidence affected the defendant's substantial rights." *Wishert*, 654 S.W.3d at 333 (citing *Colvin*, 54 S.W.3d at 85) (addressing harm caused by the trial court's failure to conduct a Rule 403 balancing test and concluding said error did not affect the appellant's substantial rights after concluding the probative value of the complained-of evidence was not substantially outweighed by the danger of unfair prejudice). Because Rule 403 favors the admissibility of relevant evidence, it is presumed that relevant evidence will be "more probative than prejudicial." *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002); *Montgomery v. State*, 810 S.W.2d 372, 388 (Tex. Crim. App. 1990) (op. on reh'g); *see also De La Paz*, 279 S.W.3d at 343 & n.17. The intent of Rule 403 is not to exclude all evidence that tends to prejudice the opponent's case. *See Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010). Rather, it only prevents the admission of evidence that promotes a jury's decision on an improper basis. *See Id.*; *Montgomery*, 810 S.W.2d at 389; *Render v. State*, 347 S.W.3d 905, 921 (Tex. App.—Eastland 2011, pet. ref'd).

21

Regarding the probative value of Jackie's testimony, we note "evidence that a defendant has sexually abused another child is relevant to whether the defendant sexually abused the child-complainant in the charged case." *Caston v. State*, 549 S.W.3d 601, 612 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (first citing *Robisheaux v. State*, 483 S.W.3d 205, 220–21 (Tex. App.—Austin 2016, pet ref'd); and then citing *Gaytan v. State*, 331 S.W.3d 218, 228 (Tex. App.—Austin 2011, pet. ref'd)). "Because the evidence of prior sexual abuse of children 'was especially probative of [the defendant's] propensity to sexually assault children,' the Rule 403 balancing test normally will not favor the exclusion of evidence of the defendant's prior sexual assaults of children." *Alvarez v. State*, 491 S.W.3d 362, 371 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd) (quoting *Belcher*, 474 S.W.3d at 848). Here, Gabriel was convicted as a party to King's sexual abuse of Jill. In such a case, evidence King sexually abused Jackie is highly probative of whether he sexually abused Jill, which was in turn highly probative of Gabriel's culpability as a party to his conduct. We conclude this factor weighs in favor of admissibility.[3] *See Prible*, 175 S.W.3d at 733.

Regarding the potential to impress the jury in some irrational yet indelible way, Gabriel only argues "[t]he accusation of being a criminal generally is poison to the health of a fair trial." However, "Rule 403 protects a criminal defendant against *unfair* prejudice, not just any prejudice." *Wishert*, 654 S.W.3d at 334 (emphasis in original); *see also James*

---

[3] Gabriel suggests the probative value of Jackie's testimony was "attenuated" because "her credibility was dubious" when considering her testimony indicating she "lied" to police. However, the Texas Court of Criminal Appeals has emphasized the "credibility of evidence to establish 'other crimes, wrongs, or acts' is not a proper inquiry for the trial court in ruling on the exclusion, *vel non,* of relevant evidence under Rule 403." *Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1990). Thus, we conclude it is inappropriate for this Court to consider Jackie's credibility in conducting our Rule 403 analysis.

*v. State*, 623 S.W.3d 533, 549 (Tex. App.—Fort Worth 2021, no pet.) ("Evidence is not excludable under Rule 403 if it is merely prejudicial; 'all evidence against a defendant is . . . designed to be prejudicial.'" (alteration in original) (quoting *Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013))). Furthermore, Article 38.37 allows for the admissibility of a defendant's prior sexual assault of children. "The statute itself recognizes that evidence of children whom the defendant has previously sexually assaulted is 'by definition, propensity, or character evidence.'" *Alvarez*, 491 S.W.3d at 371 (quoting *Bradshaw v. State*, 466 S.W.3d 875, 884 (Tex. App.—Texarkana 2015, pet. ref'd)). It also recognizes "that character evidence is [not] an 'irrational' basis for determining a person's conduct." *Id.* Gabriel has not identified any particular facts derived from Jackie's testimony that are uniquely or unfairly prejudicial, and we have found none. Furthermore, Jackie's testimony "discussed actions that were no more serious than the allegations forming the basis for the indictment." *Robisheaux*, 483 S.W.3d at 220. We conclude this factor weighs in favor of admissibility. *See Prible*, 175 S.W.3d at 733.

Regarding the time needed to develop the evidence, we note the reporter's record contains approximately 309 pages of testimony from the guilt phase of Gabriel's trial. Jackie's testimony took approximately 33 pages of that record. Thus, Jackie's testimony took a little over one-tenth of the trial. We further note Jackie was one of eight witnesses presented by the State. Those witnesses took up approximately 232 pages. Under these circumstances, we conclude the State did not spend an inordinate amount of time in developing Jackie's testimony, and this factor weighs in favor of admissibility. *See id.*

Regarding the State's need for the evidence, Gabriel argues the State had "no

23

need to bring in yet another bolstering witness" in light of other witnesses' testimony presented at trial. We disagree. The State presented no physical evidence that Jill was sexually abused by King, nor physical evidence of Gabriel's culpability as a party to his conduct. Without Jackie's testimony concerning the similar acts of sexual abuse King committed against her, as well as Gabriel's knowledge, participation, aid, and encouragement of those acts, the State's case would have come down to Jill's word against Gabriel's. *See Robisheaux,* 483 S.W.3d at 220 (holding the State's need-for-the-evidence factor weighed in favor of admission because, without a witness's extraneous offense testimony, "the State's case would have basically come down to" the complainant's word against the defendant's in a sexual assault of a child case). And Jill's credibility was clearly a significant issue in the case because Gabriel's primary defensive theory[4] was that no sexual abuse occurred. Thus, we conclude the State had great need for Jackie's testimony, and this factor weighs in favor of admissibility. *See Prible*, 175 S.W.3d at 733.

---

[4] During opening statements, Gabriel's counsel stated the following:

Of course you will hear that there's more to this story. There's always more to the story. It may not be about [King], but it's about [King]. If [King]'s allegations are not true, there's nothing. Nothing. No harm. No foul.

So you're going to hear that [Jill] had a reason to say what she said and that she got what she wanted after she said what she said, and you're going to hear that when [Gabriel] testifies. You're going to hear that when [Gabriel] looks you right in the eyes and says that she is not guilty.

She's going to say it didn't happen. She's going to say, "If it did happen, I surely didn't know about it." But she thinks it didn't happen. She's going to tell you that herself. She's going to look you right in the eye, and she's going to say, "I'm not guilty."

And we're going to ask you, after you hear all the testimony and watch all of the witnesses and weigh what they have to say and why they may have said it, that you will go and we will ask you to return a verdict of not guilty.

Because all four non-exhaustive factors weigh in favor of admissibility, we conclude the probative value of Jackie's testimony was not substantially outweighed by the danger of unfair prejudice. *See id.* Consequently, we conclude the trial court's error in failing to conduct the balancing test did not affect Gabriel's substantial rights. *See Wishert*, 654 S.W.3d at 333; *Colvin*, 54 S.W.3d at 85; *Daraghmeh*, 2014 WL 7269924, at *4–5; TEX. R. APP. P. 44.2(b). We overrule Gabriel's first issue.

### 2. King's Suicide

In her second issue, Gabriel argues the trial court abused its discretion when it admitted evidence of King's suicide over her objections. Specifically, Gabriel argues that the trial court initially

> articulated a well-reasoned basis for excluding the evidence, i.e., prejudice that would harm [Gabriel] because there would be no way to ascertain why [King] killed himself. Here[,] without revising its finding of prejudice[,] the [trial] court made an unwarranted leap of logic to find that mere evidence of medical problems mentioned by [Gabriel] in her testimony converted [King]'s suicide into an act driven by consciousness of guilt. The [trial] court erred by abusing its discretion in allowing into evidence (that the [trial] court had found was more prejudicial to [Gabriel] than probative) by concluding that [Gabriel] opened the door to consciousness of guilt by testifying to [King]'s medical issues.

We construe Gabriel's argument as a challenge to the trial court's rulings concerning her Rule 403 and Rule 404 objections. *See* TEX. R. EVID. 403, 404. We disagree with Gabriel's arguments concerning both.

We first address Gabriel's argument concerning Rule 404. Gabriel argues the trial court erred in determining that her testimony concerning King's health conditions opened the door to evidence of his suicide. *See Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009) ("Evidence that is otherwise inadmissible may become admissible when

25

a party opens the door to such evidence"). This argument is premised on the notion that evidence of King's suicide violated Rule 404. It is unnecessary to evaluate whether Gabriel's testimony opened the door to said evidence because the trial court could have reasonably concluded it was admissible for purposes other than showing character conformity, such as showing consciousness of guilt. *See* TEX. R. EVID. 404(b); *Wishert*, 654 S.W.3d at 330 (noting appellate courts uphold a trial court's evidentiary ruling, "even if the trial court's reasoning is flawed, if it is correct on any theory of law that finds support in the record and is applicable to the case"). "Texas courts recognize 'consciousness of guilt' as an exception to [R]ule 404(b)'s general prohibition against evidence of extraneous [crimes, wrongs, or acts]." *Hedrick v. State*, 473 S.W.3d 824, 830 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (first citing *Torres v. State*, 794 S.W.2d 596, 598–99 (Tex. App.—Austin 1990, no pet.); and then citing *Peoples v. State,* 874 S.W.2d 804, 809 (Tex. App.—Fort Worth 1994, pet. ref'd)).

"A 'consciousness of guilt' may be one of the strongest indicators of guilt." *Hance v. State*, 714 S.W.3d 775, 816 (Tex. App.—Fort Worth 2025, no pet.) (quoting *Lee v. State*, 866 S.W.2d 298, 302 (Tex. App.—Fort Worth 1993, pet. ref'd)). "For example, acts that are designed to reduce the likelihood of prosecution, conviction, or incarceration are admissible to show the defendant's 'consciousness of guilt.'" *Id.* (quoting *Hedrick*, 473 S.W.3d at 830). "Evidence that a defendant attempted suicide after the offense is relevant to show the defendant's consciousness of guilt." *Lamerand v. State*, 540 S.W.3d 252, 261 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd). "And evidence of a consciousness of guilt, in turn, is relevant to show that the defendant committed the offense." *Id.* (citing

*Ross v. State*, 154 S.W.3d 804, 812 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd)). It follows that evidence of King's suicide raised an inference of his consciousness of guilt, which in turn was relevant to show he committed the acts of sexual abuse against Jill, which was further relevant toward Gabriel's culpability for his conduct. *See id.* Therefore, Rule 404(b) did not prohibit evidence of King's suicide and we conclude the trial court did not abuse its discretion in overruling Gabriel's Rule 404 objection. *See De La Paz*, 279 S.W.3d at 343; *Reyna*, ___ S.W.3d ___, 2026 WL 842977, at *3; *Wishert*, 654 S.W.3d at 330.

We next address Gabriel's Rule 403 objection. Though the trial court initially ruled that evidence of King's suicide was "more . . . prejudicial than probative," it implicitly found otherwise once it determined that Gabriel's testimony opened the door to said evidence and permitted its admission over Gabriel's objections. To the extent Gabriel suggests that there was "no logical connection" for the trial court to divert from its initial ruling concerning unfair prejudice, we conduct a Rule 403 analysis. *See Prible*, 175 S.W.3d at 733.

Evidence of King's suicide was highly probative because, as previously discussed, it showed he had consciousness of guilt, raising an inference that he sexually abused Jill. *See Lamerand*, 540 S.W.3d at 261. Because evidence of King's suicide was highly probative of his own conduct, it also was in turn highly probative of Gabriel's culpability as a party to his conduct. *See id.* In addition, the jury was presented evidence that King and Gabriel attempted to commit suicide together. Gabriel does not dispute that evidence of her own suicide attempt was properly admitted. We conclude this factor weighs in favor of admissibility. *See Prible*, 175 S.W.3d at 733.

27

Gabriel has not identified any reason to support a conclusion that the evidence impressed upon the jury in some irrational yet indelible way or otherwise influenced the jury to decide the case on an improper basis, and we have found none.[5] While evidence of King's suicide likely carried some emotional weight, we see no reason why this evidence would irrationally influence the jury when considering the other emotionally-charged evidence that was presented to the jury. We conclude this factor weighs in favor of admissibility. *See id.* We also conclude the time needed to develop the evidence weighs in favor of admissibility because the State developed the evidence during its cross-examination of Gabriel, which took up less than two pages of the 309 pages of testimony found in the reporter's record. *See id.*

Even without the evidence of King's suicide, the State presented sufficient evidence to convict Gabriel through Jill's testimony because "[t]he uncorroborated testimony of a child victim alone is sufficient to support a conviction for a sexual offense." *Perez v. State*, 689 S.W.3d 369, 378 (Tex. App.—Corpus Christi–Edinburg 2024, no pet.) (citing TEX. CODE CRIM. PROC. art. 38.07(b)(1)). However, as previously mentioned, Jill's credibility was a central issue in the case because Gabriel's primary defensive theory was that no such sexual abuse occurred. As previously discussed, the State presented no physical evidence pertaining to King's acts of sexual abuse nor physical evidence of Gabriel's culpability as a party to his conduct. Thus, the State needed the evidence to show King's consciousness of guilt, which raised an inference that he sexually abused

---

[5] We note that Gabriel did not conduct an analysis of the Rule 403 factors with respect to the evidence of King's suicide in her brief.

Jill and Jackie. *See Hayden*, 296 S.W.3d at 554. We conclude this factor weighs in favor of admissibility. *See Prible*, 175 S.W.3d at 733.

Because all four non-exhaustive factors weigh in favor of admissibility, we hold the trial court did not abuse its discretion in implicitly ruling that the probative value of King's suicide was not substantially outweighed by the danger of unfair prejudice. *See De La Paz*, 279 S.W.3d at 343; *Reyna*, ___ S.W.3d ___, 2026 WL 842977, at *3; TEX. R. EVID. 403. Accordingly, we overrule Gabriel's second issue.

### 3.  Hallman's Testimony Concerning Jackie's Statement

In her third issue, Gabriel argues the trial court abused its discretion when it refused to allow "impeachment of [Jill]'s testimony by evidence that [Jackie] had told [Hallman] that [Jill] was lying, which harmed [Gabriel]." Gabriel further argues "[s]uch testimony would have impeached the claim of both [Jill] as well as [Jackie] against both [Gabriel] and [King]." We construe Gabriel's argument as a challenge to the trial court's ruling sustaining the State's hearsay objection regarding the excluded evidence.

"The hearsay doctrine, codified in Rules 801 and 802 of the Texas Rules of Evidence, is designed to exclude out-of-court statements offered for the truth of the matter asserted that pose any of the four 'hearsay dangers' of faulty perception, faulty memory, accidental miscommunication, or insincerity." *Fischer v. State*, 252 S.W.3d 375, 378 (Tex. Crim. App. 2008); *see also* TEX. R. EVID. 801, 802. "The numerous exceptions to the hearsay rule set out in Rules 803 and 804 are based upon the rationale that some hearsay statements contain such strong independent, circumstantial guarantees of trustworthiness that the risk of the four hearsay dangers is minimal while the probative

29

value of such evidence is high." *Fischer*, 252 S.W.3d at 378. "The twenty-four hearsay exceptions listed in . . . Rule 803 may be roughly categorized into (1) unreflective statements, (2) reliable documents, and (3) reputation evidence." *Id.* at 379; *see also* TEX. R. EVID. 803. "The rationale for all of the exceptions is that, over time, experience has shown that these types of statements are generally reliable and trustworthy." *Id.* One such exception is a statement against interest. *See* TEX. R. EVID. 803 (24).

"A witness' prior inconsistent statement is admissible for impeachment, but as substantive evidence of the truth of the matter asserted, it is inadmissible unless a hearsay exception applies." *Lund v. State*, 366 S.W.3d 848, 855 (Tex. App.—Texarkana 2012, pet. ref'd); *see also* TEX. R. EVID. 613(a). "Thus, when such a statement is offered for impeachment, it is admitted only to show the witness has previously made an inconsistent statement and, for that purpose, the evidence is not hearsay." *Id.* A party may impeach a witness with evidence of a prior inconsistent statement if the party first presents the witness with the existence of the statement, the details and circumstances surrounding the statement, and gives the witness the opportunity to explain or deny the statement. TEX. R. EVID. 613(a). To be admissible under Texas Rule of Evidence 613(a), a prior statement must be inconsistent with the one given at trial. *Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002). If a party fails to establish this predicate, the trial court should sustain an objection to extrinsic proof of the prior inconsistent statement. *Ferguson v. State*, 97 S.W.3d 293, 296 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd).

As demonstrated above, the State argued at trial the excluded testimony was hearsay, and Gabriel responded it was admissible as a statement against Jackie's

interest and a prior inconsistent statement "upon further exploration." The trial court sustained the State's objection. While Gabriel appears to argue in her brief the excluded testimony was impeachment evidence, she otherwise provides no analysis explaining why that in and of itself shows the trial court erred in sustaining the State's hearsay objection. Further, Gabriel does not re-urge on appeal any of the arguments she made at trial in response to the State's objection. Specifically, Gabriel does not argue or provide analysis concerning her assertion at trial that the excluded testimony was admissible as a prior inconsistent statement under Rule 613(a). *See Lund*, 366 S.W.3d at 855 (recognizing that a prior inconsistent statement may be admissible for impeachment purposes); TEX. R. EVID. 613(a) (setting out the requirements for admission of a witness's prior inconsistent statement). She also provides no argument or analysis concerning her assertion that the excluded testimony was admissible as a statement against Jackie's interest. *See* TEX. R. EVID. 803(24). Under these circumstances, Gabriel has failed to show that the trial court abused its discretion when granting the State's hearsay objection. *See Reyna*, ___ S.W.3d ___, 2026 WL 842977, at *3. Accordingly, we overrule Gabriel's third issue.

## V. CONCLUSION

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
9th day of July, 2026.

31